### MORGAN GILFORD v. THE STATE.

No. 3437.   Decided February 7, 1906.

**Burglary—Verdict—Misconduct of Jury—Motion for New Trial.**

Where upon a motion for new trial, after a conviction of burglary, the court
heard evidence upon the question of misconduct of the jury which developed
overbearing treatment of one of the jurors by his fellows, and that defendant's
character and that of his family were discussed by the jury concerning extra-
neous matter which would not have even been admissible as evidence; and that
the defendant was a damn negro anyway and it would make no difference if he
was sent to the penitentiary even if he was innocent. Held that because of
such misconduct of the jury the verdict must be set aside.

Appeal from the District Court of Walker. Tried below before
Hon. Gordon Boone.

Appeal from a conviction of burglary; penalty, two years imprison-
ment in the penitentiary.

The opinion states the case.

*Hill, Williams & Elkins,* for appellant.—On question of miscon-
duct of the jury: Mitchell v. State, 36 S. W. Rep., 456; Blocker v. State,
61 id., 391; Ysaguirre v. State, 58 id., 1005; Tate v. State, 42 id.,
595; Holmes v. State, id., 996; Lankster v. State, 3 Texas Ct. Rep.,
437.

*Howard Martin,* Assistant Attorney-General, and *Dean, Humph-
rey & Powell,* for the State.

DAVIDSON, PRESIDING JUDGE.—This conviction was for burglary,
two years in the penitentiary being fixed as the punishment. The main
proposition is the misconduct of the jury after their retirement to
consider their verdict. Wilson testified that while considering their
verdict a member of the jury made the following statement: "That
these negroes have been running over the Polanders down there,
and imposing on them; and that Polander girls down there in that
country had had children by negroes; negro babies." He expressed
regret that the same should have come up on motion for new trial,

but he says: "I have sat upon many a jury, and I rather think that I have never seen men act so rough to one juror in my life. I could not remember everything that was said and done." The remark in regard to the Polanders, he says, was made by Strange. He further stated, "that he (Strange) lived down there and knew all about them." He says the further statement was made, that this defendant "was nothing but a damn negro anyhow, and it would not hurt him to serve two years in the penitentiary, if he was innocent." "I could not remember everything, and I thought it was pretty rough. I do not like the way they proceeded against me. They were all opposed to me and I could not tell you what all was said, but I thought there were some pretty hard words said. It was said in opposition to the stand I took." On cross-examination, he said: "I think it was Parrish who made the statement, 'that it was nothing but a damn negro, anyway, and it would make no difference if he was sent to the penitentiary even if he was innocent.' There was right smart excitement in the room, and Parrish said something about his being a God damn negro, and there were several talking. He might have said, 'If he went to the penitentiary it would not hurt,' but it came up and he was talking. I could not catch all that was said. Some of them said it. I think it was Parrish who said it."

Parrish testified that he did not make the statement, "that it was nothing but a damn negro any how, and if we sent him to the penitentiary for two years it would make no difference, even if he was innocent," and did not hear anybody make that statement. He denied hearing the statement to the effect that the negroes were imposing on the Polanders or that defendant (who was a negro) had been imposing on the Polanders. He further stated, "that he believed some one said that it was very probable that the negroes in that community did impose on them, but they did not bring it up as a positive fact." On cross-examination he testified: "I said this: I said that eleven men on the jury only proposed to give him two years, and we all believed him guilty and we did not think Wilson should hold us there on a proposition of that kind. I don't remember making the statement, 'that defendant wasn't anything but a damn negro anyhow.' I said that he (defendant) as a negro, wouldn't injure his standing in the community to go to the penitentiary for two years. I might have said that. I did not say that I would send him to the penitentiary, even if he was innocent. I cannot say as a fact that we discussed in the jury room, and that statements were made by gentlemen on that jury, that these negroes were in the habit of running over the Polanders, and those negroes made the Polanders get out of the road down there. I do not think I heard that said in the jury room. I did not hear it said as a positive fact, whether they did or not. I might have heard it brought out as a supposition. There was something like that said to the jury, that the Polanders had to get out of the road for the negroes down there."

Strange stated that he told the jury he knew· the parties, but denied telling them that the negroes had been running over the Polanders in that community. On cross-examination he further stated: "The only thing I heard: The case had been dropped, and we were sitting after supper, and Wilson got to talking about that Edna affair, and one thing said brought on another; and Wilson said there was a case here, or close here, where there was a white girl had a child by a negro; and I said there was a case down there at Waverly similar to that one; and that is all I heard about negro babies, and it was not in reference to this case. I did not say that the negroes down there were getting negro babies from the Polander girls."

Levi Justice, denied hearing the statement imputed to Strange, as well as that imputed to Parrish; but would not swear that something like it was not said. He says, "I am not prepared under oath to contradict and say that such a statement was not made. I say that I did not hear it."

Lindley testified that he did not hear Frame or Strange or any member of the jury before the rendition of the verdict say, that these negroes (referring to defendant and his family) had been imposing on and running over the Polanders down there (referring to the alleged owner, Buchna), and these negroes had been getting babes by Polish girls. He said he did not hear the remark imputed to Parrish. However, there was some remark made about it, but it was not in evidence, and some one spoke up and said, "We are not saying this, and it hasn't anything to do with the case." Parrish said something about a damn negro, but I did not hear the balance of the discussion and did not pay any attention to it.

Cunningham testified that he heard some remark of the nature that it was nothing but a damn negro. It was in connection with the argument in the jury room. He says that he could not remember everything that was said. There was something said in regard to the Polanders and the negroes and that the Polanders were ignorant, and afraid of the negroes anyhow; and that these negroes were supposed to be reckless anyhow and had no doubt been mistreating the Polanders, or something like that; that it might be a lesson to him if he was put in the penitentiary for two years, and be beneficial for him anyhow. He further says, "I considered that was before the jury, and we had a right to consider that without being in connection with the case." He says, "There was something said about the Polanders being afraid of the negroes, and that they were a cowardly sort of people. That was in reply to what Frank Buchna said about seeing the negro that night, and failing to stop him. It was said that Buchna was afraid of the negro, and would let him go rather than undertake to stop him." On recross-examination this juror further stated: that Strange said he knew the family (referring to appellant's family); and that he did not like them so well. It was in that con-

nection that the discussion took place about sending the negro to the penitentiary for two years, and that it would do him good. Strange further stated that he knew these negroes, and had known them, and they did not stand so well. He said he did not think they had a good reputation. This witness further stated: "I have known the Polanders a good while, and I remarked to the jury that I knew the Polanders were a peaceful kind of people, and are not a resentful people. That they would take a good deal off of negoes." He further said: "I said that these negroes were spoken of as being bad negroes, and no doubt the Polander was afraid to stop the negro that night."

Frame testified, among other things, "I think Parrish said, 'Why didn't they put the other damn negroes on the witness stand that came up here?' but he did not hear the other remark imputed to Parrish." He further stated: "I think they took Wilson off at the time and probably that might have been said out of my hearing. I would not swear that such a statement was not made that these gentlemen have detailed. They took Wilson turn about; we hauled him over the coals. I thought it was plain enough. We all argued the matter with him."

J. R. Wilson, recalled, stated: "Strange made the statement to me that these negroes had been running over the Polanders, and that Polish girls had had children by these negroes, but all the jury did not hear that. Strange made that statement to me. He said that these Polanders were afraid of the negroes. I told him that I thought it was a strange thing that when the Polander saw the negro coming out his smokehouse with the sack of meat on his shoulder, and was within three feet of him, he did not grab hold of it; and he (Strange) remarked, 'he is afraid of him as death.' Strange voluntarily made the statement to me that the negroes were getting babies by the Polander girls. He did not say that this defendant had done anything of the kind."

This is the substance of the evidence detailed on motion for new trial, though it covers several pages, and the examination was continued at some length both by direct, cross, re-direct and re-cross-examination. We are. not willing that the verdict should stand when such conduct by the jury has been had. The testimony of the juror, Wilson, in regard to the overbearing treatment of himself by some of the other jurors is not only not contradicted, but is sustained by one or more of those who testified in regard to that phase of the motion. That appellant's character and that of his family was discussed, is shown by the evidence on this phase of the motion. Without going further and summing up the testimony, we think it is of such a nature and the conduct of the jury of such a character that this court cannot afford to allow this verdict to stand. There is no reason or excuse why the jurors should act in this manner. If the evidence is sufficient to sustain the verdict, the consideration of the jury should

be relegated alone to the facts under the charge given by the court. Extrinsic evidence and extraneous matter should not be gone over in the jury room, nor permitted to enter into their decision of the case. The maters occurring in the jury room with reference to the extrinsic facts and extraneous matter would not have been permitted to go before the jury in aid of the State's case if offered as evidence. Because of the misconduct of the jury, the conviction is set aside, and the judgment is reversed and the cause remanded.

*Reversed and remanded.*